The opinion of the court was delivered by
Stegall, J.:
Following our reversal of the convictions in his first trial, Christopher Tahah was once again tried and convicted of felony murder and the underlying felony of criminal discharge of a firearm at an occupied dwelling. Tahah has now filed another direct appeal, raising four issues: (1) The district court erred in failing to give lesser included offense instructions to the felony-murder charge; (2) prosecutorial misconduct deprived him of a fair trial; (3) judicial misconduct deprived him of a fair trial; and (4) his constitutional rights were violated because he was subjected to an increased sentence based on a criminal history finding that was not decided by a jury beyond a reasonable doubt. Finding no reversible error, we affirm Tahah’s convictions.
Factual and Procedural Background
The facts arising from the second trial are not in dispute and do not deviate substantially from the recitation contained in our earlier opinion. See State v. Tahah, 293 Kan. 267, 262 P.3d 1045 (2011) (Tahah I). In sum, Tahah, a Dodge City police officer, began dating the victim, Erin Jones, in Januaiy 2007. The relationship quickly became serious. However, in April, Jones abruptly broke it off. Tahah did not respond well.
On May 4; 2007, Tahah observed Jones dancing with another man at a bar. The next day, Jones was found in her bedroom, dead from a single gunshot wound to the head. After Jones’ body was discovered, Sergeant Slickers of the Dodge City Police Department went to Tahah’s apartment accompanied by KBI Agents Jason LaRue and Mark Kendrick. The KBI officials seized Tahah’s service weapon and then conducted the first of three interviews, during which they informed Tahah that Jones was dead. Tahah appeared to be upset by the news. Agent LaRue testified that during the interview Tahah said that he had considered revenge on Jones but did not act on those feelings.
*785 KBI officials secured a search warrant for Tahah’s apartment and thereafter conducted searches on May 6 and May 11, during which they seized inculpatoiy items such as a Winchester .270 rifle, shell casings, and dark clothing.
On May 7, Tahah. again spoke with KBI agents, but then he left town, driving to Denver, Colorado. Tahah would testify that he contemplated suicide multiple times while in Denver. On May 11, Tahah attempted to return to Dodge City in a stolen vehicle but was apprehended by Colorado law enforcement officers. Tahah confessed to a Colorado State Patrol sergeant that he murdered his ex-girlfriend die previous Friday with a .270 Winchester. Tahah then produced a written confession to that effect.
KBI Agent Kendrick drove to Colorado and interviewed Tahah for die third time. In this videotaped interview, Tahah gave an explicit, detailed confession in which he confessed that after seeing Jones dance with another man, Tahah changed into dark clothing, retrieved his loaded Winchester .270 rifle, and went to Jones’ house to lay in wait until he believed Jones was home alone. Tahah said he first considered breaking into Jones’ bedroom, which had an access door to the backyard. Tahah abandoned that plan after noticing the access door also had a storm door, which may have impeded his entry. Tahah then decided that he would fire a shot tiirough both doors’ glass windows in order to scare Jones. Tahah claimed that at the last minute- he decided his plan was no good, but the rifle accidentally discharged as he lowered it from his aim at Jones’ bedroom door. Tahah said that he then ran out of the backyard, got in his car, and returned home.
At trial, however, Tahah testified that his confessions to the Colorado and Kansas authorities were untrue. He admitted driving by Jones’ house twice on the night of her murder but denied killing her. When asked why he would admit to sometiiing he did not do, Tahah said that he wanted to give Jones’ family closure in case he was killed while in prison.
At the conclusion of the trial, the jury was instructed on felony murder—as well as second-degree reckless murder and involuntary manslaughter as lesser included offenses. The jury convicted Tahah *786 on the charges of felony murder and criminal discharge of a firearm at an occupied building.
Lesser Included Offense Instructions
Tahah argues the district court erred in refusing to give his requested instruction for voluntaiy manslaughter. In addition, he claims that the district court should have also instructed the jury on intentional second-degree murder, even though no request for that instruction was made.

Standard of Review

Although we undertake a different analysis depending on whether a party has requested a jury instruction, we always determine whether the instruction was legally appropriate before making any finding of error. State v. Smyser, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

Analysis

At the time of Tahah’s first trial, Kansas applied a judicially created lesser included offense rule in felony-murder cases. This rule provided that lesser included offense instructions were necessary only when evidence of the underlying felony was weak, inconclusive, or conflicting. See State v. Boone, 277 Kan. 208, 219, 83 P.3d 195 (2004) (quoting State v. Branning, 271 Kan. 877, 887, 26 P.3d 673 [2001]). Then, in State v. Berry, 292 Kan. 493, 513, 254 P.3d 1276 (2011), we held that the statutory mandate in K.S.A. 22-3414(3) governed the use of lesser included offense instructions in felony-murder cases. Indeed, relying on Bern/, we reversed Ta-hah’s first conviction for felony murder because the district court failed to give lesser included offense instructions. Tahah I, 293 Kan. at 273.
Following Tahah I, the legislature amended the criminal code to provide that felony murder has no lesser included offenses. See K.S.A. 2012 Supp. 21-5109. In State v. Wells, 297 Kan. 741, 761, 305 P.3d 568 (2013), we held that the statutory amendment did not apply retroactively. Tahah now relies on Wells to claim that he was legally entitled to the lesser included offense instructions. But after Wells, the legislature again amended the law to make the *787 elimination of lesser included offenses for felony murder retroactive. L. 2013, ch. 96, sec. 2. At oral argument, Tahah’s counsel argued that the legislative amendments to K.S.A. 21-5402 violate the Ex Post Facto Clause of the United States Constitution. However, we previously addressed and rejected this argument in State v. Todd, 299 Kan. 263, 279, 323 P.3d 829 (2014).
Tahah has not presented any new or persuasive argument compelling us to overturn Todd. Therefore, pursuant to our precedent, we find that lesser included offense instructions for felony murder are not legally appropriate. As such, the district court did not err in failing to give the additional lesser included offense instructions that Tahalí now claims the jury should have received.
Prosecutorial Misconduct
Tahah next claims that the prosecutor committed three instances of misconduct during the trial: (1) an opening statement reference to Tahah “going hunting” for Jones; (2) a closing argument reference to Tahah’s “way of thinking;” and (3) closing argument comments that Tahalí “cannot have it both ways.” Although we find that the prosecutor misstated the law by arguing that Tahah “cannot have it both ways,” we find that the misstatement is harmless.

Standard of Review

A claim of prosecutorial misconduct based on comments made during voir dire, opening statements, or closing arguments is reviewable on appeal even absent a contemporaneous objection. State v. King, 288 Kan. 333, 349, 204 P.3d 585 (2009). Such review involves a two-step process. State v. Brown, 298 Kan. 1040, 1050, 318 P.3d 1005 (2014). First, we decide whether the comments were outside the wide latitude that a prosecutor is permitted in discussing the evidence. 298 Kan. at 1050. Second, if the comments were improper and therefore error, we then decide whether the comments prejudiced the jury against the defendant and deprived the defendant of a fair trial. 298 Kan. at 1050. Under the second step, we consider three factors: (1) whether the error was gross and flagrant; (2) whether the error was motivated by ill will; and (3) whether the evidence was of such a direct and overwhelming *788 nature that the error would have had little weight in the mind of a juror. 298 Kan. at 1050. In conducting this analysis, the standard of constitutional harmlessness must be met to avoid a finding of reversible error. 298 Kan. at 1050-51; see also State v. Bridges, 297 Kan. 989, 1012-13, 306 P.3d 244 (2013) (once the State meets the higher constitutional harmless error standard, the lower statutory standard in K.S.A. 60-261 is necessarily met).

Analysis

1. “Going hunting”
During opening statements, in the context of previewing Tahah’s videotaped confession, the prosecutor explained that Tahah admitted that he went home after seeing Jones at Central Station; he changed into dark clothes; and he went to Jones’ house. The prosecutor then said:
“But what he was really doing was going hunting for Erin, because he took along his .270 rifle, but not before he took three live shells, cartridges. And, the magazine of this .270 rifle holds three shells. It’s a built-in magazine, so you have to open the bolt. You have to force the cartridges into a spring loaded magazine, and then you close the bolt.”
The prosecutor went on to describe how Tahah “sneaked down the alley” and “secluded himself on the north side of the house with his dark clothing and his .270 rifle loaded, and waited for [Jones] to come home.”
“ ‘[A] prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence.’ ” State v. Crawford, 300 Kan. 740, 749, 334 P.3d 311 (2014) (quoting State v. McCaslin, 291 Kan. 697, 722, 245 P.3d 1030 [2011], overruled on other grounds by State v. Astorga, 299 Kan. 395, 324 P.3d 1046 [2014]). We find that the prosecutor’s comments constitute a reasonable inference from the evidence admitted through Tahah’s videotaped confession. Tahah admitted that after seeing Jones at a bar dancing with another man, he returned home and changed into dark clothing, retrieved his loaded rifle, went to Jones’ house, hid outside, and waited for her to come home before sneaking into her backyard and firing the weapon into her bedroom. The prosecutor’s characterization of these actions as *789 hunting is reasonable. A prosecutor may use picturesque speech so long as he or she refers to facts disclosed by the evidence. Crawford, 300 Kan. at 749.
Further, even though the State did not need to prove Tahalí intended to kill, i.e., “hunted for” Jones to sustain a conviction for the charged crime of felony murder, the State did need to prove that Tahah maliciously and intentionally discharged a firearm into an occupied building without authorization in order to establish the underlying felony of criminal discharge of a firearm at an occupied building. See K.S.A. 21-4219(b). Therefore, discussion of this evidence was relevant to the State’s case. See State v. Story, 300 Kan. 702, 713, 334 P.3d 297 (2014) (A prosecutor may use analogies or rhetoric in an attempt to bring order to the facts presented at trial and place them in meaningful context.). Although Tahah’s videotaped confession indicated that he accidentally discharged the rifle, the prosecutor’s characterization of the other statements contained in his confession was relevant to show that Tahah did not accidentally discharge the rifle; but instead, he intentionally and maliciously fired it into Jones’ bedroom. We therefore conclude that the prosecutor’s reference to “going hunting” was not error.
2. “Way of thinking”
During the rebuttal portion of his closing argument, the prosecutor, in discrediting Tahah’s trial testimony that he gave a false confession, said:
“One of the first things the Defendant said on the witness stand last Friday: I want to tell you I am not responsible for Erin’s murder. I[s] i[t] reasonable to conclude that in his way of thinking, he is not responsible? In his way of thinking, she, Erin, has to take die responsibility for her murder. If Erin would have just loved him, she would be alive. If Erin had not rejected him, she would still be alive. If Erin would have allowed him to be her guy, instead of dancing and making plans to date Jason Carpenter, she would still be alive. It is her fault she is dead. He is not responsible for her actions which led down the path of his revenge.” (Emphasis added.)
Tahalí argues that the prosecutor’s statement constitutes a mis-characterization of the evidence because Tahah “never said these things or even implied them. Thus, the prosecutor went outside *790 the wide latitude allowed in suggesting this was Mr. TahalTs way of thinking.’ ”
The prosecutor s comments were given as an alternative explanation for Tali ah’s decision to recant his original confession, i.e., he had convinced himself that he was not “responsible” for Jones’ murder. “[W]hen a case turns on conflicting stories, it is proper for a prosecutor to assert reasonable inferences based on the evidence and to argue that certain testimony is not believable, but the jury must be left to draw ultimate credibility determinations.” State v. Holt, 300 Kan. 985, 1002-03, 336 P.3d 312 (2014).
Moreover, the prosecutor’s inference was reasonable and supported by the evidence of record. During his videotaped confession, Tahah admitted that on the night of the murder, he was upset after seeing Jones dance with another man. Tahah also said that he wanted to scare Jones because she had hurt him by breaking off their relationship. KBI Agent LaRue tesdfied that Tahah admitted to thoughts of revenge against Jones. The evidence supported a finding that TahalTs “way of thinking” was to exact revenge on Jones for breaking up with him. As such, the prosecutor properly inferred that Tahah recanted his confession because, in his mind, he was not responsible for Jones’ murder, i.e., that she deserved what happened to her because she hurt him. We conclude that the prosecutor’s statement was not error because it was a reasonable inference drawn from the evidence.
3. “Cannot have it both ways”
The jury was first instructed on first-degree felony murder. The jury was then instructed that if it did not agree that Tahah was guilty of first-degree murder, then it should consider the lesser included offense of murder in the second degree, which was defined as the unintentional but reckless killing of Jones. During closing arguments, the prosecutor stated:
“[PROSECUTOR]: There are some lesser included instructions that the Court gave you.
“Aristotle, the great philosopher, wrote extensively on logic. He concluded that two contradictory statements cannot coexist in the truth. In a layman’s terms, you cannot have it both ways. The Defendant cannot claim, on one hand, he was not *791 there and did not pull the trigger and Mil Erin Jones, at that same time claim that if he was there, it was unintentional and recHess.
“[DEFENSE COUNSEL]: Your Honor, I’m gonna object. That mischaracter-izes what the law is.
“THE COURT: Overruled.
“[DEFENSE COUNSEL]: You’ve already given lesser includeds at this point.
“THE COURT: Sustained. Move back to the evidence, Mr. Malone.
“[PROSECUTOR]: An example would be J.F.K.’s assassination. Lee Harvey Oswald, like him saying I was not there on the sixth floor of the depository, of the Texas book depository, and did not pull tifie trigger. Rut, if I was, it was all just accidental or reckless, not intentional.
“The true verdict that the State is asMng you to render is one of guilty on criminal discharge of a weapon and guilty on the felony murder of Erin Jones. Thank you.” (Emphasis added.)
Tahah argues that the prosecutor’s statements constitute a misstatement of law and fact. With regard to the law, Tahah claims that a defendant is entitled to present more than one theory of defense, even if the theories are inconsistent. The State contends that the prosecutor was not making a legal statement about the jury instructions but rather arguing that the jury could only believe one of Tahah’s stories.
While the prosecutor’s comment referenced the lesser included offenses (which we held above were not legally appropriate and therefore not legally available to Tahah), the thrust of the prosecutor’s argument to the jury attacked Tahah’s factual defense—i.e., the claim that “he wasn’t there” but that if he was there, the shooting was “unintentional and reckless.” Despite the fact that Tahah was not legally entitled to any lesser included instructions on the felony murder charge, he remained legally entitled to offer factually inconsistent defenses to the jury. State v. Sappington, 285 Kan. 158, 164, 169 P.3d 1096 (2007) (“the general rule in criminal cases is that even inconsistent defenses are generally permissible”). Thus, the prosecutor’s statement that Tahah “cannot have it both ways,” in the context of discussing Tahah’s factually inconsistent defenses is a misstatement of the law and therefore constitutes error. See State v. Akins, 298 Kan. 592, 606, 315 P.3d 868 (2014) (prosecutor’s misstatement of law constitutes misconduct).
Turning to the second step, we first consider whether the misconduct was gross and flagrant. In making this determination, we *792 take into account “whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a clear and unequivocal rule, or violated a rule designed to protect a constitutional right.” State v. Marshall, 294 Kan. 850, Syl. ¶ 6, 281 P.3d 1112 (2012). Here, the prosecutor s statements regarding contradictory statements occurred at the very end of closing argument and were not repeated or emphasized. We find the misconduct was not gross and flagrant, and this first factor weighs against a finding of prejudice. However, because the prosecutor continued with his improper argument after the district court directed him to return to the evidence, we find that the prosecutor’s misconduct was motivated by ill will. See Marshall, 294 Kan. 850, Syl. ¶ 7 (prosecutor’s misconduct may be motivated by ill will where it was deliberate, repeated, or in apparent indifference to court’s ruling). As such, the second factor weighs in favor of a finding of prejudice.
Lastly, we find that the third factor weighs against reversal because any prejudicial effect of the prosecutor’s misconduct is substantially outweighed by the direct and overwhelming evidence against Tahalí. Therefore, when the prosecutor’s statements are considered in light of the record as a whole, we conclude that there is no reasonable possibility that the misconduct contributed to the verdict. See Bridges, 297 Kan. at 1012-13.
Preliminary Instructions
At the beginning of the trial, the district court provided several preliminary instructions to the newly impaneled jury. Taliah claims that the district court committed judicial misconduct while giving the instruction that warned tire jury against considering any information outside of the evidence presented at trial. The district court told the jurors that consideration of outside information could result in a mistrial, which “is a tremendous expense and inconvenience to the parties, the Court and the tax payers.” Tahah argues this statement violates State v. Salts, 288 Kan. 263, 266, 200 P.3d 464 (2009), where we held that an instruction informing jurors that “ ‘another trial would be a burden on both sides,’ ” was misleading and inaccurate and therefore error.

*793
Standard of Review

Tahalí characterizes this issue as judicial misconduct, rather than instructional error, and argues that it is subject to de novo review on appeal, despite his lack of a contemporaneous objection. However, judicial misconduct claims do not typically encompass a judge’s instructions to the jury. See State v. Kemble, 291 Kan. 109, 113, 238 P.3d 251 (2010) (An appellate court must review the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct.). Further, the district court’s verbatim recitation of PIK Civ. 4th 101.12, the instruction for impaneled jurors in civil cases, establishes that the issue should be reviewed as instructional error.
Tahalí concedes that he failed to raise this issue below. Generally, issues not raised before the trial court cannot be raised on appeal. State v. Johnson, 293 Kan. 959, 964, 270 P.3d 1135 (2012). When dealing with instructions given at the close of the evidence, Kansas statute mandates that we review errors asserted for the first time on appeal for clear error. See K.S.A. 22-3414(3). There is no parallel statute setting forth our standard of review for claimed errors in a trial court’s preliminary instructions.
We have held, however, that the clearly erroneous standard along with its availability as an exception to the contemporaneous objection rule predates its statutory codification. State v. Williams, 295 Kan. 506, 510-12, 286 P.3d 195 (2012). Thus, we have always reviewed unpreserved claims of instructional error—regardless of when the alleged error occurred during the trial process—for clear error. Sams v. Commercial Standard Ins. Co., 157 Kan. 278, 287, 139 P.2d 859 (1943) (“[T]he general rule is that where no objection is made to the giving of an instruction during the trial and no request was made for its modification or clarification and such instruction is not clearly erroneous a litigant cannot be heard to complain on appeal.”). Finally, the clear error standard is in reality a heightened standard of harmlessness. Williams, 295 Kan. at 511 (clear error standard “more akin to stating a harmless error test than a standard of review”). Thus, we must first determine whether *794 die claimed error in the preliminary instructions was legally and factually appropriate.

Analysis

In Salts, the district court provided the following oral and written jury instruction, without objection, before deliberations began:
“ ‘Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is tiren up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. Another trial would be a burden on both sides.’ ” 288 Kan. at 264.
Salts appealed, and this court held that the language, “ ‘another trial would be a burden on both sides,’ ” was misleading and inaccurate because a second trial would not necessarily be burdensome to both sides and because a jury is not to concern itself with what happens after arriving at a verdict. 288 Kan. at 266-67.
Tahalí urges us to expand the holding of Salts to apply to preliminary jury instructions as well as to the Allen instruction at issue in Salts (an Allen instruction is any instruction “that encourages the jury to reach a unanimous verdict so as to avoid a mistrial.” United States v. McElhiney, 275 F.3d 928, 935 [10th Cir. 2001]; see Allen v. United States, 164 U.S. 492, 501-02, 17 S. Ct. 154, 41 L. Ed. 528 [1896]). We have a long and justified history of disapproving Allen-type jury instructions. In fact, our disapproval of this type of instruction, when given to the jury during deadlocked deliberations, pre-dates Allen itself. See State v. Bybee, 17 Kan. 462, 466-67, 1877 WL 898 (1877). Likewise, we have carefully scrutinized written Allen-type instructions given to the jury at the close of trial. See, e.g., Salts, 288 Kan. at 266 (disapproving the language “ ‘[ajnother trial would be a burden on both sides’ ” in PIK Crim. 3d 68.12); State v. Scott-Herring, 284 Kan. 172, 180-81, 159 P.3d 1028 (2007) (approving 2005 modifications to deadlocked juiy instruction, PIK Crim. 3d 68.12).
These concerns are well grounded and we do not alter our approach to these instructional questions today. An Allen instruction risks coercing a unanimous verdict by unduly influencing jurors to compromise their views on the evidence simply to avoid a hung *795 jury. Because of its coercive character, the Allen instruction has rightly been described as factually inaccurate. A new trial due to a hung jury is likely not, in fact, an inconvenience to the defendant— especially when measured against a coerced conviction. See Salts, 288 Kan. at 266 (“[A] second trial may be burdensome to some but not all on either side of a criminal case.”).
The preliminary jury instruction here, however, is not an Allen instruction. Its character and purpose are entirely different. The instruction occurred at the start of trial, before tire presentation of evidence, and warned jurors of the dangers of a mistrial resulting from their own misconduct. As such, its coercive effect (to prevent juror misconduct) is entirely proper and justified. Moreover, because its purpose is proper, the instruction is factually accurate. The prospect of a mistrial due to juror misconduct—especially when viewed from the pretrial vantage point of the parties—is, in fact, equally inconvenient and undesirable to both parties. In particular, it interferes with the defendant’s right to a speedy resolution of the criminal allegations against him or her. Given this significant distinction, the Salts rationale is inapplicable here.
Juror misconduct imposes grave costs not only to the parties and others involved in the trial process, but significantly to the integrity of our jury trial criminal justice system itself, which depends on tire honest and ethical behavior of jurors. We do not need to look far to see the ease with which today s smartphone equipped jurors can commit misconduct—perhaps even innocently. See State v. Prator, No. 111,103, 2015 WL 1123138, at *5 (Kan. App. 2015) (unpublished opinion) (affirming the denial of motion for mistrial after jurors used internet to look up definitions of words used in jury instructions). In light of these considerations, we hold that the warning against juror misconduct contained in PIK Civ. 4th 101.12 is both legally and factually accurate in the criminal context as well as the civil.
Imposition of Enhanced Sentence
Lastly, Tahah argues that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated because the State did not include his prior convictions in the *796 complaint or prove them to the jury beyond a reasonable doubt when imposing an enhanced sentence. We have conclusively rejected this claim in State v. Ivory, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Tahah has not proffered any argument or authority as to why we should overrule Ivoiy. As such, we find the imposition of his enhanced sentence was proper.
Tahah’s convictions and sentence are affirmed.
* * *